## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRITTANY SIMON, individually and on behalf of all others similarly situated, | Case No. 23-3428 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| NEW YORK-PRESBYTERIAN HEALTHCARE SYSTEM, INC. and THE NEW YORK AND PRESBYTERIAN HOSPITAL, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Brittany Simon, individually and on behalf of all others similarly situated (hereinafter "Plaintiff"), brings this Class Action Complaint against Defendants New York-Presbyterian Healthcare System, Inc. ("NYP Health") and The New York and Presbyterian Hospital ("NYP Hospital") (collectively, "Defendants"), and alleges, upon personal knowledge as to her own actions, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.    Plaintiff brings this case to address Defendants' outrageous, illegal, and widespread practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook").

2.    Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information

1

can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

3.      Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how healthcare providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, **no** healthcare provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

4.      Defendants operate a healthcare system based in the State of New York that consists of 10 hospitals and campuses in New York, nearly 200 primary and specialty care clinics and medical groups throughout New York, and approximately 48,000 employees.[1] In spite of their unique position as a massive and trusted healthcare provider, Defendants knowingly configured and implemented a software device known as a Tracking Pixel to collect and transmit information from nyp.org (the "Website" or "Online Platforms") to third parties, including information

---

[1] *Quest Diagnostics and New York-Presbyterian Agree to Laboratory Services Transaction*, QUEST DIAGNOSTICS, https://newsroom.questdiagnostics.com/2023-02-14-Quest-Diagnostics-and-NewYork-Presbyterian-Agree-to-Laboratory-Services-Transaction (last visited Apr. 18, 2023); *see Our Locations*, NEWYORK-PRESBYTERIAN, https://www.nyp.org/locations (last visited Apr. 18, 2023).

communicated in sensitive and presumptively confidential patient searches such as through the "Find a Doctor" tab (the "Disclosure").[2]

5.    Defendants encourage patients to use their Online Platforms for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, signing up for events and classes, and more.[3]

6.    Plaintiff and other Class Members who used Defendants' Website thought they were communicating only with their trusted healthcare provider. Unbeknownst to Plaintiff and Class Members, however, Defendants have embedded the Facebook Tracking Pixel (the "Pixel" or "Facebook Pixel") on their Website, surreptitiously forcing Plaintiff and Class Members to transmit to Facebook every click, keystroke, and intimate detail about their medical treatment. Operating as designed and as implemented by Defendants, the Pixel allows the Private Information that Plaintiff and Class Members submit to Defendants to be unlawfully disclosed to Facebook alongside the individual's unique and persistent Facebook ID ("FID").[4]

7.    A pixel is a piece of code that "tracks the people and [the] type of actions they take"[5] as they interact with a website, including how long a person spends on a particular web

---

[2] *NewYork-Presbyterian Hospital Health Data Notice*, NEW YORK-PRESBYTERIAN, https://www.nyp.org/hospital-health-data-notice (last visited Apr. 18, 2023).

[3] *See NewYork-Presbyterian*, NEW YORK-PRESBYTERIAN, https://www.nyp.org/ (last visited Apr. 18, 2023) (listing the website's "Find a Doctor" function at the top of the home page); *Telehealth*, NEW YORK-PRESBYTERIAN, https://www.nyp.org/digital-health (last visited Apr. 18, 2023).

[4] The Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." *What are cookies?*, CLOUDFLARE, https://www.cloudflare.com/learning/privacy /what-are-cookies/ (last visited Mar. 21, 2023). "Cookies help inform websites about the user, enabling the websites to personalize the user experience." *Id.*

[5] *Regargeting*, FACEBOOK, https://www.facebook.com/business/goals/retargeting (last visited Mar. 21, 2023).

page, which buttons the person clicks, which pages they view, and the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), among other things.

8.      The user's web browser executes the Pixel via instructions within the webpage to communicate certain information based on parameters selected by the website's owner. The Facebook Pixel is thus customizable and programmable, meaning that the website owner controls which of its pages contain the Pixel and which events are tracked and transmitted to Facebook. By installing the Facebook Pixel on its Website, Defendants effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to disclose their communications with Defendants to Facebook.

9.      In addition to the Facebook Pixel, Defendants also installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on their Website servers.[6]

10.     Unlike the Facebook Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Private Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers.[7]

---

[6] "CAPI works with your Facebook pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir ElKamouny, *How to Implement Facebook Conversions API (In Shopify)*, FETCH&FUNNEL, https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Mar. 21, 2023).

[7] *What is the Facebook Conversion SPI and How to Use It*, REVEALBOT BLOG, https://revealbot.com/blog/facebook-conversions-api/ (last visited Mar. 21, 2023). "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel . . . . This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." *Conversions API*, META FOR DEVELOPERS, https://developers.facebook. com/docs/marketing-api/conversions-api (last visited Mar. 21, 2023).

Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[8]

11.     Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendants to circumvent any ad blockers or other denials of consent by the website user that would prevent the Pixel from sending website users' Private Information to Facebook directly.

12.     Defendants utilized the Pixel and CAPI data for marketing purposes in an effort to bolster its profits. The Facebook Pixel and CAPI are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting and future marketing. Facebook also uses Plaintiff's and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Defendants.

13.     The information that Defendants' Tracking Pixel and CAPI sent to Facebook included the Private Information that Plaintiff and Class Members submitted to Defendants' Website, including for example, the type of medical treatment sought, the individual's particular health condition, and the fact that the individual attempted to or did book a medical appointment.

14.     Such information allows a third-party (e.g., Facebook) to know that a specific patient was seeking confidential medical care. Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers who geotarget Plaintiff's and Class Members' Facebook pages based on communications obtained via the Facebook Pixel and CAPI. Facebook and any third-party purchasers of Plaintiff's and Class Members' Private Information

---

[8] *About Conversions API*, META, https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Mar. 21, 2023).

also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

15.    Healthcare patients simply do not anticipate that their trusted healthcare provider will send personal health information or confidential medical information collected via its webpages to a hidden third party—let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without the patient's consent. Neither Plaintiff nor any other Class Member signed a written authorization permitting Defendants to send their Private Information to Facebook.

16.    Despite willfully and intentionally incorporating the Facebook Pixel and CAPI into their Website and servers, Defendants have never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with Facebook. Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to Facebook as they communicated with their healthcare provider via the Website, or stored on Defendants' servers to be later transmitted to Facebook so it could be used for targeted advertising and marketing purposes.

17.    Defendants further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendants.

18.    Defendants owed common law, statutory, and regulatory duties to keep Plaintiff's and Class Members' communications and medical information safe, secure, and confidential.

19.    Upon information and belief, Defendants utilized the Pixel data to improve and to save costs on its marketing campaigns, improve its data analytics, and attract new patients.

20.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

21.     Defendants breached their statutory and common law obligations to Plaintiff and Class Members by, *inter alia*: (i) failing to adequately review their marketing programs and web based technology to ensure the Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing, and conspiring with third-parties to intercept communications sent and received by Plaintiff and Class Members; (iv) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook or others; (v) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Facebook Pixels; (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

22.     Plaintiff seeks to remedy these harms and bring causes of action for (I) Negligence, (II) Negligence Per Se, (III) Breach of Implied Contract, (IV) Unjust Enrichment, (V) Breach of Fiduciary Duty, (VI) Violation of the Electronic Communications Privacy Act, and (VII) Violation of New York General Business Law § 349.

## THE PARTIES

23.     Plaintiff Brittany Simon is a natural person, resident, and a citizen of New York. She has no intention of moving to a different state in the immediate future. Plaintiff is a current patient of Defendants.

24.     Defendant NYP Health is a New York non-profit corporation with its principal place of business at 525 East 68th Street, New York, New York 10065. NYP Health can be served

with process in this matter through its registered agent for service, Office of Legal Affairs, New York-Presbyterian Hospital, at Attn: General Counsel, 466 Lexington Avenue – Box 36, 13th Floor, New York, New York 10017.

25.     Defendant NYP Hospital is a New York non-profit corporation with its principal place of business at 525 East 68th Street, New York, New York 10065. NYP Hospital can be served with process in this matter through its registered agent for service, New York-Presbyterian Hospital, Office of Legal Affairs, at Attn: Risk Management, 466 Lexington Avenue – Box 36, 13th Floor, New York, New York 10017.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative class members defined below, and minimal diversity exists because a significant portion of the putative class members are citizens of a state different from the citizenship of at least one Defendant.

27.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's and the Class Members' claims raise a federal question under the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq.* This Court has supplemental jurisdiction over Plaintiff's state law claims because they arise from the same transaction or occurrence and share a common nucleus of operative facts with Plaintiff's and Class Members' ECPA claim.

28.     This Court has personal jurisdiction over Defendants because Defendants are organized under the laws of the State of New York and headquartered within the State of New York; therefore, Defendants reside in New York. Additionally, Defendants have substantial

contacts with this District and have purposely availed themselves of the Courts in this District.

29.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because Defendants conducts substantial business in this District and a substantial part of the events and conduct giving rise to Plaintiff's and the Class Members' claims emanated from activities within this District.

## COMMON FACTUAL ALLEGATIONS

### A. Background

30.     Defendants are one of the largest healthcare providers in the State of New York and serves many of its patients via its Online Platforms, which it encourages patients to use for searching for providers, scheduling appointments and/or procedures, communicating with their healthcare providers, reviewing their medical histories, and communicating other information related to their treatment and status as a patient.

31.     Defendants use their Website to connect Plaintiff and Class Members to Defendants' online healthcare platforms with the goal of increasing profitability.

32.     In furtherance of that goal, and to increase the success of their advertising and marketing, Defendants purposely installed the Facebook Pixel and Facebook's Conversions API tools on many of the webpages within their Website and on their servers and programmed those webpages and servers. In doing so, Defendants surreptitiously shared patients' private and protected communications with Facebook, including communications that contain Plaintiff's and Class Members' Private Information.

33.     To better understand Defendants' unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows:

### i.    *Facebook's Business Tools and the Pixel*

34.    Facebook operates the world's largest social media company, which generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[9]

35.    In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendants, to utilize its "Business Tools" to gather, identify, target, and market products and services to individuals.

36.    Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

37.    The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, the webpage's Universal Resource Locator ("URL"), as well as metadata, button clicks, and other information.[10] Businesses that want to target customers and advertise their services, such as Defendants, can track other user actions and can create their own tracking parameters by building a "custom event."[11]

---

[9] *Meta Reports Fourth Quarter and Full Year 2021 Results*, META INVESTOR RELATIONS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Dec. 2, 2022).

[10] *Specifications for Meta Pixel Standard Events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Mar. 21, 2023); *see also Facebook Pixel, Accurate Event Tracking, Advanced*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/advanced (last visited Mar. 21, 2023); *see also Best Practices for Meta Pixel Setup*, FACEBOOK, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last visited Mar. 21, 2023); *App Events API*, FACEBOOK, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Mar. 21, 2023).

[11] *About Standard and Custom Website Events*, FACEBOOK, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last visited Mar. 21, 2023); *see also App Events API*, *supra* note 10.

38.     One such Business Tool is the Pixel that "tracks the people and type of actions they take."[12] When a user accesses a webpage that is hosting the Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook—traveling from the user's browser to Facebook's server.

39.     Notably, this transmission only occurs on webpages that contain a Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate privacy (such as the homepage) and disable it on pages that do implicate patient privacy. Thus, Plaintiff's and Class Members' Private Information would not have been disclosed to Facebook via the Pixel but for Defendants' decisions to install the Pixel on their Website and specifically on webpages that solicit and receive Private Information.

40.     Similarly, Plaintiff's and Class Members' Private Information would not have been disclosed to Facebook via Conversions API but for Defendants' decisions to install and implement that tool on its servers.

41.     By installing and implementing both tools, Defendants caused Plaintiff's and Class Members' communications to be intercepted and transmitted from Plaintiff's and Class Members' browsers directly to Facebook via the Pixel, or to be recorded on Defendants' servers and then transferred to Facebook via Conversions API.[13]

---

[12] *Retargeting*, *supra* note 5.

[13] Facebook assigns a unique "event_id" parameter to each separate communication with a website and then duplicates the data based on the event_id so that the same event tracked by the Pixel and recorded by the CAPI are not reported as two separate events. *Set Up Conversions API for Server-Side Tagging in Google Tag Manager*, FACEBOOK, https://www.facebook.com/business/help/702509907046774 (last visited Mar. 21, 2023).

*ii. Defendants' method of transmitting Plaintiff's and Class Members' Private Information via the Tracking Pixel and/or Conversion API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Pixel*

42.     Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as a computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

43.     Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

44.     Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.[14]

45.     GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

46.     When an individual visits Defendants' Website, their web browser sends an HTTP Request to Defendants' servers that essentially asks Defendants' Website to retrieve certain information (such as Defendants' "Find a Doctor" page). Defendants' servers send the HTTP Response, which contains the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendants' Website.

---

[14] *See supra* note 4.

47.    Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user, and this is exactly what happened when patients used Defendants' Website and Online Platforms.

48.    Defendants' implementation of the Pixel is source code that acted much like a traditional wiretap, intercepting and transmitting communications intended only for Defendants.

49.    Separate from the Pixel, Facebook and other website owners can place third-party cookies in the web browsers of users logged into their websites or services. These cookies can uniquely identify the user so the cookie owner can track the user as he or she moves around the internet—whether on the cookie owner's website or not. Facebook uses this type of third-party cookie when Facebook account holders use the Facebook app or website. As a result, when a Facebook account holder uses Defendants' Website, a unique id is sent to Facebook along with the intercepted communication that allows Facebook to identify the patient associated with the Private Information it has intercepted.

50.    With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. To counteract this, third parties bent on gathering data and Private Information implement workarounds that are difficult to detect or evade. Facebook's workaround is its Conversions API tool, which is particularly effective because the data transmitted via this tool does not rely on the website visitor's web browsers. Rather, the information travels directly from Defendants' server to Facebook's server.

51.     Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]."[15] Thus, Defendants receive and store communications with patients on its server before Conversions API collects and sends those communications—and the Private Information contained therein—to Facebook.

52.     Notably, client devices do not have access to host servers and thus cannot prevent (or even detect) this additional transmission of information to Facebook.

53.     While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the host server, Facebook instructs companies like Defendants to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Defendants "to share website events [with Facebook] that the pixel may lose."[16] Thus, since Defendants implemented the Pixel in accordance with Facebook's documentation, it is also reasonable to infer that Defendants implemented the Conversions API tool on its website.

54.     The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content on the host website. In other words, Facebook and others like it are not providing anything to the user related to the user's communications. Instead, these third parties are typically procured to track user data and communications only to serve the marketing purposes of the website owner (*i.e.*, to bolster profits).

55.     Thus, without any knowledge, authorization, or action by the user, website owners like Defendants can use their source code to commandeer patients' computing devices, causing

---

[15] *Prepare Your Business to Use the Conversions API*, FACEBOOK, https://www.facebook.com/business/help/1295064530841207?id=818855032317965 (last visited Mar. 21, 2023).

[16] *Best Practices for Conversions API*, FACEBOOK, https://www.facebook.com/business/help/308855623839366?id=%20818859032317965 (last visited Mar. 21, 2023).

the devices' web browsers to contemporaneously and invisibly re-direct the patients' communications to hidden third parties like Facebook.

56.     In this case, Defendants employed the Tracking Pixel and Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

57.     Consequently, when Plaintiff and Class Members visited Defendants' website and communicated their Private Information, including but not limited to, medical treatment sought, medical conditions, appointment type and date, physician selected, specific button/menu selections, content (such as searches for symptoms or treatment options) typed into free text boxes, demographic information, email addresses, phone numbers, and emergency contact information, it is simultaneously intercepted and transmitted to Facebook.

### iii. Defendants Violated their own Privacy Policies

58.     Defendants' Notice of Privacy Practices provides:

Weill Cornell Medicine, NewYork-Presbyterian, and Columbia University participate in an Organized Health Care Arrangement (OHCA). This allows us to share health information to carry out treatment, payment, and joint health care operations relating to the OHCA, including integrated information system management, health information exchange, financial and billing services, insurance, quality improvement, and risk management activities. Organizations that will follow this notice include Weill Cornell Medicine, NewYork-Presbyterian sites, Columbia University and their entities.

This Notice describes how medical information about you may be used and disclosed and how you can get access to this information.[17]

---

[17]    *Notice of Privacy Practices*, NEWYORK-PRESBYTERIAN (Apr. 2, 2018), https://nypsite.prod.acquia-sites.com/sites/default/files/acquiadam/2020-09/privacy_notice_english.pdf.

59.     Defendants' Notice of Privacy Practices does not permit Defendants to use and disclose Plaintiff's and Class Members' Private Information for marketing purposes without written permission.[18]

60.     Defendants violated their own Notice of Privacy Practices by unlawfully disclosing Plaintiff's and Class Members' Private Information to Meta (Facebook), Google, and likely other third parties.

61.     Defendants' Notice of Privacy Practices further states:

**Our Responsibilities**
- We are required by law to maintain the privacy and security of your protected health information.
- We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information.
- We must follow the duties and privacy practices described in this notice and give you a copy of it.
- We will not use or share your information other than as described here unless you tell us we can in writing. If you tell us we can, you may change your mind at any time. Let us know in writing if you change your mind.

. . .

**Other Instructions for Notice**
- In addition to the Federal rules regarding privacy, we will follow New York State laws regarding health care privacy. We will obtain appropriate consents before we share information concerning your genetic information, HIV status, substance abuse and certain mental health information. We also will obtain your consent for other uses and disclosures of your health information when required by New York law to do so.[19]

62.     Defendants' Website Privacy Policy further represents as follows:

Thank you for visiting NewYork-Presbyterian Hospital ("NYP"). NYP is committed to protecting the privacy and security of visitors to our website. The website privacy policy ("Privacy Policy") will tell you what information we collect, how it is used and your options as you interact with out website. By using this website, you agree to this policy. . . . "Protected health information" as defined under the Health Insurance Portability & Accountability Act and related regulations

---

[18] *See id.*

[19] *Id.*

16

(collectively referred to as "HIPAA"), including information you provide to an NYP facility or to our affiliated entities, ColumbiaDoctors and Weill Cornell Medicine, while being treated as a patient or within the Connect portal, is separate and subject to our Notice of Privacy Practices.

. . .

**Data Security**

NYP is committed to protecting the privacy of the personal information you provide to us via this website so that we can make sure it remains as secure as possible. Accordingly, we use reasonable efforts to prevent unauthorized access. We use a secure firewall and a security infrastructure that protects the integrity and privacy of personal information submitted to us via this website. As an additional security measure, your personal information is also encrypted during transmission using appropriate technology. This is an industry standard. (Encryption is a common method used to protect transmission of sensitive data across the Internet.)

. . .

**Cookies, Tracking and Internet-based Advertising**

This website works with third-party products or services ("Service Providers"). These include Google, Piwik PRO, and other Service Providers who help us track and analyze visitor activity on the website, measure the effectiveness of our advertising efforts, and support the optimization of our digital marketing campaigns.

This website uses "cookies," tracking pixels and related technologies. These can be set by NYP or by our Service Providers.

. . .

Examples of information we and our Service Providers collect include how often someone visits this website and what they do while on the website. We and our Service Providers use this information in the aggregate to understand how our visitors as a group use different resources and to help us improve our website. We and our Service Providers also collect information about the activity of individual website users. This information may be used to direct related NYP advertisements and/or informational content to website users when they visit other websites. . . .

. . .

Our Service Providers may acquire additional information about your activity on our website, including pages you visit, access times, duration of visit, how you arrived at our website and your IP address. An IP address is a number that identifies a device connected to the Internet. For most devices, the IP address changes on at least a weekly basis. Our Service Providers may also acquire device identifiers and specific information about the browser you use. In some cases, this information may be unique to you.

NYP also uses third-party platforms provided by Google, Facebook, Apple, Microsoft, and other providers to manage and deliver digital advertisements about its services on third-party, non-NYP websites. In providing this service, these platforms may collect limited data related to your activity on those third-party websites using technology such as cookies to deliver NYP advertisements on those websites to users that may find them relevant. . . .[20]

63.     While Defendants' Website Privacy Policy assures patients, such as Plaintiff and Class Members, that their PHI is governed by Defendants' Notice of Privacy Practices and not subject to the "Cookies, Tracking and Internet-based Advertising" policies outlined above, Defendants nonetheless configured the Tracking Pixel on their Website to surreptitiously record and send patients' PII *and PHI* to unauthorized third parties.

64.     Defendants violated their own Notice of Privacy Practices and Website Privacy Policy by unlawfully disclosing Plaintiff's and Class Members' Private Information to Meta (Facebook), Google, and likely other third parties. Defendants further misrepresented that they would preserve the privacy and security of Plaintiff's and Class Members' Private Information.

### iv.  Uncovering the Disclosure and Defendants' Data Breach Notification

65.     In or around June 2022, The Markup, a nonprofit newsroom and media organization focusing on technology and its effects on society, conducted an investigation of the use of tracking tools, such as the Facebook Pixel, on the online platforms of Newsweek's top 100 hospitals in America.[21]

---

[20]     *Website Privacy Policy*, NEW YORK-PRESBYTERIAN, https://www.loyolamedicine.org/terms-of-use-and-online-privacy/ (last visited Apr. 18, 2023).

[21] Todd Feathers et al, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

66.    The Markup discovered the Facebook Pixel was operating on 33 of the 100 hospitals investigated.[22] Defendants were one such hospital found operating the Pixel on their website—specifically, the webpage that allows patients to book appointments with healthcare providers.[23]

67.    Following notification by The Markup of the risks the Pixel poses to the security of patients' Private Information, Defendants failed to remove the Pixel from their Website and appointment scheduling webpage.[24]

68.    On or about March 20, 2023, Defendants posted a "NewYork-Presbyterian Hospital Health Data Notice" on its website, which informed Plaintiff and Class Members (in substantially the same form) of the breach:

> NewYork-Presbyterian Hospital ("NYP") strives to provide exceptional, personalized care that always puts our patients first. We value our patients and community members and understand that maintaining your privacy is of the utmost importance.
>
> Recently, NYP became aware of an issue relating to its use of tracking and analytics tools on our public-facing, www.nyp.org website that may have resulted in the sharing of certain patients' information with the developers of these tools. NYP began using these tools from third-party service providers on www.nyp.org to understand how visitors interacted with the website. These tools allowed NYP to review website activity to streamline external communications, monitor community engagement and make it easier for patients to connect with care that they need.
>
> NYP disabled the trackers and worked with a forensic firm to conduct a full analysis of the information that these tools had collected and shared.
>
> In January of 2023, NYP learned that certain information of patients requesting appointments or second opinions, or initiating a virtual urgent care visit on www.nyp.org may have been accessed by NYP's third-party technology service providers. We then reviewed that matter further and determined that the tracking

---

[22] *Id.*

[23] *Id.*

[24] *Id.*

and analytics tools accessed IP addresses and the URL/website addresses of the pages visited, which may have included the provider name and specialty listed on NYP.org. In addition, certain tools were also able to access first name, last name, email address, mailing address, and/or gender if that information was entered on particular pages of the website.[25]

69.    An example illustrates the point.  If a user visits Defendants' website; enters a condition or provider name (such as "Chronic Obstructive Pulmonary Disease/COPD"), their address, and their insurance carrier name under the "Find a Doctor" tab; and clicks the search button, the individual's browser sends a request to Defendants' server requesting that it load the search results webpage. Because Defendants utilize the Facebook Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, causing the browser to secretly duplicate the communication with Defendants, transmitting it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity.

70.    Thus, along with the individual's Facebook ID, IP address, and other identifying information, Defendants also transmit the user's health insurance information and that they are seeking treatment for COPD to Facebook, Google, and others that Defendants have configured their Pixel to interact with.

71.    After collecting and intercepting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

72.    Every time Defendants send a patient's website activity data to Facebook, that patient's PII is also disclosed, including their Facebook ID ("FID"). An FID is a unique and persistent identifier that Facebook assigns to each user. With it, anyone can look up the user's Facebook profile and name. Notably, while Facebook can easily identify any individual on its

---

[25] *NewYork-Presbyterian Hospital Health Data Notice*, *supra* note 2.

Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to the corresponding Facebook profile and the person's real-world identity. A user who accesses Defendants' Online Platforms while logged into Facebook will transmit the user cookie to Facebook, which contains that user's unencrypted Facebook ID.

73.     Google and other companies likewise process this data in a similar manner and use it to connect the information to particular individuals to build marketing and other data profiles.

74.     Through the Pixel, Defendants share their patients' identities and online activity, including personal information and search results related to their private medical treatment.

75.     Defendants could have configured their tracking software to limit the information that it communicated to third parties, but they did not and instead intentionally selected the features and functionality of the Pixel that resulted in the Disclosure.

76.     Plaintiff never consented, agreed, authorized, or otherwise permitted Defendants to disclose her Private Information or assist with intercepting her communications. Plaintiff was never provided with any written notice that Defendants discloses its patients' protected health information, nor was she provided any means of opting out of such disclosures. Defendants nonetheless knowingly disclosed Plaintiff's protected health information to Meta (Facebook), Google, and other unauthorized entities.

77.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendants to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

21

78.    By law, Plaintiff is entitled to privacy in her protected health information and confidential communications. Defendants deprived Plaintiff and Class Members of their privacy rights when they: (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential communications, personally identifiable information, and protected health information; (2) disclosed patients' protected information to Facebook and others—unauthorized third-party eavesdroppers; and (3) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent. Plaintiff did not discover that Defendants disclosed her personally identifiable information and protected health information to Facebook and Google and assisted Facebook and Google with intercepting their communications.

**B.  Plaintiff Brittany Simon's Experience**

79.    Plaintiff received healthcare services from one of the hospitals in Defendants' network and relied on Defendants' digital healthcare platforms to communicate confidential patient information.

80.    Plaintiff accessed Defendants' digital tools to receive healthcare services from Defendants at Defendants' direction and encouragement. Plaintiff reasonably expected that her online communications with Defendants were confidential, solely between herself and Defendants, and that such communications would not be transmitted to or intercepted by a third party.

81.    Plaintiff is also a Facebook user and visited Defendants' website and digital platforms while logged in to Facebook.

82.    Plaintiff used Defendants' Website to schedule an appointment for medical care, review her personal health information, and communicate her Private Information to Defendants.

Plaintiff trusted that her Private Information would be safeguarded according to Defendants' privacy policies and state and federal law.

83.    As described herein, Defendants sent Plaintiff's Private Information to Meta (Facebook), Google, and others when she used Defendants' digital platforms to communicate healthcare and identifying information to Defendants.

84.    Pursuant to the process described herein, Defendants assisted Meta (Facebook), Google, and others with intercepting Plaintiff's communications, including those that contained personally identifiable information, protected health information, and related confidential information. Plaintiff facilitated these interceptions without Plaintiff's knowledge, consent, or express written authorization.

85.    By failing to receive the requisite consent, Defendants breached confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected health information.

86.    Since Plaintiff began using Defendants' digital healthcare platforms, Plaintiff has received targeted medical advertising on social media related to medical treatment.

**C.    Defendants Violated HIPAA Standards**

87.    Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[26]

88.    Guidance from the United States Department of Health and Human Services ("HHS") instructs healthcare providers that patient status alone is protected by HIPAA.

---

[26]  HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

89.     In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data . . . . If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[27]

90.     In its guidance for Marketing, HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.[28]

91.     In addition, the Office for Civil Rights (OCR) at HHS has issued a Bulletin (the "HHS Bulletin") to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies.[29]

92.     The HHS Bulletin expressly provides,

---

[27] OFFICE OF CIVIL RIGHTS, U.S. DEP'T OF HEALTH & HUMAN SERVS., GUIDANCE REGARDING METHODS FOR DE-IDENTIFICATION OF PROTECTED HEALTH INFORMATION (2012), available at https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/covered entities/De-identification/hhs_deid_guidance.pdf.

[28] OFFICE OF CIVIL RIGHTS, U.S. DEP'T OF HEALTH & HUMAN SERVS., MARKETING (2003), available at https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/covered entities/marketing.pdf.

[29] See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, U.S. DEP'T OF HEALTH & HUMAN SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 21, 2023).

Tracking technologies are used to collect and analyze information about how users interact with regulated entities' websites or mobile applications ("apps"). For example, a regulated entity may engage a technology vendor to perform such analysis as part of the regulated entity's health care operations. The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures[30] of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[31]**

93.     In other words, HHS has expressly stated that Defendants have violated HIPAA Rules by implementing the Facebook Pixel.

94.     The HHS Bulletin further noted that the impermissible disclosure of PHI can cause myriad harm to individuals, including "identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI" and discloses highly-sensitive information regarding patients' diagnoses, and the nature, frequency and location of treatment.[32]

95.     The HHS Bulletin cautioned that, "[w]hile it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is

---

[30] *See id.* at n.8 ("Regulated entities can use or disclose PHI, without an individual's written authorization, only as expressly permitted or required by the HIPAA Privacy Rule. *See* 45 CFR 164.502(a).").

[31] *Id.* (citations omitted) (emphasis added) (citing 45 C.F.R. § 164.508(a)(3); 45 C.F.R. § 164.501 (defining "Marketing")).

[32] *Id.*

critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule."[33]

96.     The HHS Bulletin explained that, through tracking technologies such as the Facebook Pixel, covered entities disclose individual's information, including PHI, provided when individuals use the entity's website or mobile applications, such as medical records numbers, addresses, appointment dates, person's IP addresses or location, medical device IDs or unique identifying codes.[34]

97.     The Bulletin further explained that "[a]ll such IIHI [individually identifiable health information] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services."[35] This is because that information "connects the individual to the regulated entity […] and thus relates to the individual's past, present, or future health or health care or payment for care."[36]

98.     Ultimately, in the Bulletin, HHS made clear that covered entities, such as Defendants, must comply with HIPAA rules in connection with tracking technologies such as the Facebook Pixel, including but not limited to:[37]

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

- Ensuring that all disclosures of PHI to tracking technology vendors are specifically permitted by the Privacy Rule and that, unless an exception applies, only the minimum necessary PHI to achieve the intended purpose is disclosed.[33]

  - Regulated entities may identify the use of tracking technologies in their website or mobile app's privacy policy, notice, or terms and conditions of use.[34] However, the Privacy Rule does **not** permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures.  Regulated entities must ensure that all tracking technology vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI.[35]

- If there is not an applicable Privacy Rule permission or if the vendor is not a business associate of the regulated entity, then the individuals' HIPAA-compliant authorizations are required **before** the PHI is disclosed to the vendor.  Website banners that ask users to accept or reject a website's use of tracking technologies, such as cookies, do **not** constitute a valid HIPAA authorization.

- Further, it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place **and** requires that there is an applicable Privacy Rule permission for disclosure.

99.     Moreover, HIPAA rules require that covered entities using tracking technologies enter into a Business Associate Agreement with any tracking technology vendor that is a Business Associate.[38]

100.     As articulated in the HHS Bulletin, covered entities utilizing tracking technologies must also implement "administrative, physical, and technical safeguards" to protect transmitted PHI, such as appropriate encryption, authentication, and audit controls; and must notify affected individuals and others of any impressible disclosure of PHI to tracking technology vendors who compromise that PHI. "In such instances, there is a presumption that there has been a breach of

---

[38] *See id.*

unsecured PHI unless the regulated entity can demonstrate that there is a low probability that the PHI has been compromised."[39]

## D.   Defendants Violated Industry Standards

101.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

102.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

103.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including, . . . personal data (informational privacy).

104.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified[, and] (b) [f]ully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity) about the purpose(s) for which access would be granted.

105.    AMA Code of Medical Ethics Opinion 3.2.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must: . . . (c) release patient information only in keeping ethics guidelines for confidentiality.

---

[39] *Id.*

**E.  Plaintiff's and Class Members' Expectation of Privacy**

106.    Plaintiff and Class Members were aware of Defendants' duty of confidentiality when they sought medical services from Defendants.

107.    Indeed, at all times when Plaintiff and Class Members provided their Private Information to Defendants, they all had a reasonable expectation that the information would remain private and that Defendants would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

**F.  IP Addresses Are Personally Identifiable Information**

108.    On information and belief, through the use of the Facebook Pixel on Defendants' Website, Defendants also disclosed and otherwise assisted Facebook with intercepting Plaintiff's and Class Members' Computer IP addresses.

109.    An IP address is a number that identifies the address of a devise connected to the Internet.

110.    IP addresses are used to identify and route communications on the Internet.

111.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

112.    Facebook tracks every IP address ever associated with a Facebook user.

113.    Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

114.    Under HIPAA, an IP address is considered personally identifiable information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses.[40]

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information."[41]

115.    Consequently, by disclosing IP addresses, Defendants' business practices violated HIPAA and industry privacy standards.

**G.  Defendants Were Enriched and Benefitted from the Use of the Pixel and Unauthorized Disclosures**

116.    The sole purpose of the use of the Facebook Pixel on Defendants' Website was marketing and profits.

117.    In exchange for disclosing the Private Information of its patients, Defendants are compensated by Facebook in the form of enhancing advertising services and more cost-efficient marketing on its platform.

118.    Retargeting is a form of online marketing that targets users with ads based on their pervious internet communications and interactions. Upon information and belief, as part of their marketing campaign, Defendants re-targeted patients and potential patients.

119.    By utilizing the Pixel, the cost of advertising and retargeting was reduced, thereby benefitting Defendants.

---

[40] *See* 45 C.F.R. § 164.514(2).

[41] 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

**H.  Plaintiff's and Class Members' Private Information Had Financial Value**

120.    Plaintiff's data and Private Information has economic value. Facebook regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients.

121.    Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

122.    The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it describes the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[42]

123.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[43]

**CLASS ACTION ALLEGATIONS**

124.    Plaintiff brings this nationwide class action on behalf of herself and on behalf of other similarly situated persons.

---

[42] Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/.

[43] Christina Farr, *Hospital Execs Say They are Getting Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

125.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

All persons Defendants identified as being among those individuals impacted by
the Disclosure, including all who were sent a notice of the Disclosure.

126.    Excluded from the Class are the following individuals and/or entities: Defendants
and Defendants' parents, subsidiaries, affiliates, officers, directors, and any entity in which either
Defendant has a controlling interest; all individuals who make a timely election to be excluded
from this proceeding using the correct protocol for opting out; any and all federal, state or local
governments, including but not limited to their departments, agencies, divisions, bureaus, boards,
sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this
litigation, was well as their immediate family members.

127.    Plaintiff reserves the right to modify or amend the definition of the proposed class
before the Court determines whether certification is appropriate.

128.    **Numerosity:** The Members of the Class are so numerous that joinder of all of them
is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time,
based on information and belief, there are hundreds or thousands of individuals whose Private
Information may have been improperly accessed in the Disclosure, and each Class Member is
apparently identifiable within Defendants' records.

129.    **Commonality:** Questions of law and fact common to the Class exist and
predominate over any questions affecting only individual Class Members. These include, without
limitation:

        a.    Whether and to what extent Defendants had a duty to protect Plaintiff's and
Class Members' Private Information;

        b.    Whether Defendants had duties not to disclose the Plaintiff's and Class
Members' Private Information to unauthorized third parties;

c.    Whether Defendants had duties not to use Plaintiff's and Class Members' Private Information for non-healthcare purposes;

d.    Whether Defendants had duties not to use Plaintiff's and Class Members' Private Information for unauthorized purposes;

e.    Whether Defendants failed to adequately safeguard Plaintiff's and Class Members' Private Information;

f.    Whether and when Defendants actually learned of the Disclosure;

g.    Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

h.    Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

i.    Whether Defendants failed to properly implement and configure the tracking software on its digital platforms to prevent the disclosure of information compromised in the Disclosure;

j.    Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Disclosure to occur;

k.    Whether Defendants engaged in unfair, unlawful, or deceptive practices by misrepresenting that it would safeguard Plaintiff's and Class Members' Private Information;

130.    **Typicality:** Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Disclosure, due to Defendants' use and incorporation of the tracking software.

131.    **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class, and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

132.    **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

133.    **Predominance:** Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored within the same computer system and unlawfully disclosed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

134.    **Superiority and Manageability:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication or relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

135.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonable consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

136.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

137.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

138.    Unless a Class-wide injunction is issued, Defendants may continue in their unlawful disclosure and failure to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Disclosure, and Defendants may continue to act unlawfully as set forth in this Complaint.

139.    Furthermore, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

140.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Defendants owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b.    Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c.    Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

d.    Whether an implied contract existed between Defendants on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e.    Whether Defendants breached the implied contract;

f. Whether Defendants adequately and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Disclosure;

h. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiff's and Class Members' Private Information; and

i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

## CAUSES OF ACTION

### COUNT I
**Negligence**
**(On Behalf of Plaintiff and the Class)**

141. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

142. Defendants knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Personal and Medical Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, misused, and disclosed to unauthorized parties.

143. As a provider of health care under the law, Defendants had a special relationship with Plaintiff and Class Members who entrusted Defendants to adequately protect their Personal and Medical Information.

144.    Defendants knew that the Personal and Medical Information at issue was private and confidential and should be protected as private and confidential, and thus, Defendants owed a duty of care not to subject Plaintiff and Class Members to an unreasonable risk of unauthorized disclosure.

145.    Defendants knew, or should have known, of the risks inherent in collecting and storing Personal and Medical Information and allowing it to be accessed by unauthorized third parties.

146.    Defendants' failure to take proper security measures to protect Plaintiff's and Class Members' Personal and Medical Information created conditions conducive to a foreseeable risk of unauthorized access and disclosure of Personal and Medical Information to unauthorized third parties. As described above, Plaintiff and Class Members are part of a foreseeable, discernable group that was at high risk of having their Personal and Medical Information compromised, and otherwise wrongly disclosed if not adequately protected by Defendants.

147.    Defendants had a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' Personal and Medical Information.

148.    Defendants owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their Personal and Medical Information being improperly disclosed to unauthorized third parties.

149.    Defendants systematically failed to provide adequate security for data in their possession or over which they had supervision and control.

150.    Defendants, through their actions and omissions, unlawfully breached duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding

Plaintiff's and Class Members' Personal and Medical Information within Defendants' possession, supervision, and control.

151.    Defendants, through their actions and omissions, unlawfully breached duties owed to Plaintiff and Class Members by failing to have appropriate procedures in place to prevent dissemination of Plaintiff's and Class Members' Personal and Medical Information.

152.    Defendants, through their actions and omissions, unlawfully breached duties to timely and fully disclose to Plaintiff and Class Members that the Personal and Medical Information within Defendants' possession, supervision, and control was improperly accessed by unauthorized third parties, the nature of this access, and precisely the type of information improperly accessed.

153.    Defendants' breach of duties owed to Plaintiff and Class Members proximately caused Plaintiff's and Class Members' Personal and Medical Information to be compromised by being accessed by unauthorized third parties.

154.    As a result, of Defendants' ongoing failure to adequately notify Plaintiff and Class Members regarding what type of Personal and Medical Information has been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages.

155.    As a proximate result of Defendants' negligence and breach of duties as set forth above, Defendants' breaches of duty caused Plaintiff and Class Members to, inter alia, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their Personal and Medical Information, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their Personal and Medical Information, all of which can constitute actionable actual damages.

156. In failing to secure Plaintiff's and Class Members' Personal and Medical Information, Defendants are guilty of oppression, fraud, or malice. Defendants acted or failed to act with a reckless, willful, or conscious disregard of Plaintiff's and Class Members' rights. Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of herself and the Class.

157. Defendants' conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' Personal and Medical Information, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendants' conduct. Plaintiff and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendants' negligence.

## COUNT II
### Negligence Per Se
### (On Behalf of Plaintiff and the Class)

158. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

159. Plaintiff alleges this negligence *per se* theory as alternative to her other negligence claims.

160. Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, Defendants were required by

law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class Members' Personal and Medical Information.

161.    Plaintiff and Class Members are within the class of persons that these statutes and rules were designed to protect.

162.    Defendants had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' Personal and Medical Information.

163.    Defendants owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their Personal and Medical Information being improperly disclosed to unauthorized third parties.

164.    It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiff's and Class Members' Personal and Medical Information in compliance with applicable laws would result in an unauthorized third-party such as Facebook gaining access to Plaintiff's and Class Members' Personal and Medical Information, resulting in Defendants' liability under principles of negligence per se.

165.    Defendants violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' Personal and Medical Information and not complying with applicable industry standards as described in detail herein.

166.    Plaintiff's and Class Member's Personal and Medical Information constitute personal property that was taken and misused as a proximate result of Defendants' negligence, resulting in harm, injury and damages to Plaintiff and Class Members.

167.    As a proximate result of Defendants' negligence and breach of duties as set forth above, Defendants' breaches of duty caused Plaintiff and Class Members to, inter alia, have their data shared with third parties without their authorization or consent, receive unwanted

advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their Personal and Medical Information, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their Personal and Medical Information, all of which can constitute actionable actual damages.

168.    In failing to secure Plaintiff's and Class Members' Personal and Medical Information, Defendants are guilty of oppression, fraud, or malice. Defendants acted or failed to act with a reckless, willful, or conscious disregard of Plaintiff's and Class Members' rights. Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of herself and the Class.

169.    Defendants' conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' Personal and Medical Information, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendants' conduct. Plaintiff and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendants' negligence *per se.*

**COUNT III**
**Breach of Implied Contract**
**(On Behalf of the Plaintiff and the Class)**

170.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

171.    Defendants solicited and invited Plaintiff and Class Members to provide their Private Information through Defendants' Online Platforms as part of their regular business practices. Plaintiff and Class Members accepted Defendants' offers and provided their Private Information to Defendants.

172.    Defendants required Plaintiff and Class Members to provide their Private Information, including full names, email addresses, phone numbers, computer IP addresses, appointment information, medical insurance information, medical provider information, medical histories, and other content submitted on Defendants' Website as a condition of their receiving healthcare services.

173.    As a condition of utilizing Defendants' Online Platforms and receiving services from Defendants, Plaintiff and Class Members provided their Private Information and compensation for their medical care. In so doing, Plaintiff and Class Members entered into contracts with Defendants by which Defendants agreed to safeguard and protect such information, in its Privacy Practices and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been breached and compromised or stolen.

174.    Implicit in the agreement between Defendants and its patients was the obligation that both parties would maintain the Private Information confidentially and securely.

175.    Defendants had an implied duty of good faith to ensure that the Private Information of Plaintiff and Class Members in its possession was only used only as authorized, such as to provide medical treatment, billing, and other medical benefits from Defendants.

176.    Defendants had an implied duty to protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses.

177.    Additionally, Defendants implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

178.    Plaintiff and Class members reasonable believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

179.    Plaintiff and Class Members fully performed their obligations under the implied contract with Defendants. Defendants did not. Plaintiff and Class Members would not have provided their confidential Private Information to Defendants in the absence of their implied contracts with Defendants and would have instead retained the opportunity to control their Private Information for uses other than medical treatment, billing, and benefits from Defendants.

180.    Consumers of medical services value their privacy and the ability to keep confidential their Private Information associated with obtaining such services. Plaintiff and Class Members would not have entrusted their Private Information to Defendants and entered into these implied contracts with Defendants without an understanding that their Private Information would be safeguarded and protected, nor would Plaintiff and Class Members have entrusted their Private Information to Defendants in the absence of Defendants' implied promise to monitor the Online Platforms, computer systems, and networks to ensure that reasonable data security measures were adopted and maintained.

181.    Defendants breached the implied contracts with Plaintiff and Class Members by disclosing Plaintiff's and Class Members' Private Information to an unauthorized third party, failing to properly safeguard and protect Plaintiff's and Class Members' Private Information; and violating industry standards as well as legal obligations that are necessarily incorporated into implied contract between Plaintiff, Class Members, and Defendants.

182.    The Disclosure was a reasonably foreseeable consequence of Defendants' actions in breach of the implied contracts.

183.    Defendants' acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their Personal Information in exchange for medical treatment and benefits.

184.    As a result of Defendants' failure to fulfill the data security protections promised in these implied contracts, Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received healthcare and other services that were of a diminished value.

185.    As a direct and proximate result of Defendants' above-described breach of contract, Plaintiff and Class Members have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities, the loss of control of their Private Information, disruption of their medical care and treatment, and the loss of the benefit of the bargain they had struck with Defendants.

186.    As a direct and proximate result of Defendants' above-described breach of contract, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

<u>**COUNT IV**</u>
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

187.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

188.    This claim is pleaded solely in the alternative to her breach of implied contract claim.

189.    Plaintiff and Class Members conferred a monetary benefit upon Defendants in the form of valuable sensitive medical information that Defendants collected from Plaintiff and Class Members under the guise of keeping this information private. Defendants collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for

valuable services from third parties. Additionally, Plaintiff and Class Members conferred a benefit on Defendants in the form of monetary compensation.

190.    Plaintiff and Class Members would not have used Defendants' services or would have paid less for those services, if they had known that Defendants would collect, use, and disclose this information to third parties.

191.    Defendants appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

192.    As a result of Defendants' conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

193.    The benefits that Defendants derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

194.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds they received as a result of their conduct and the Disclosure alleged herein.

## COUNT V
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Class)

195.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

196.    A relationship existed between Plaintiff and the Class Members on the one hand and Defendants on the other in which Plaintiff and the Class Members put their trust in Defendants to protect the Private Information of Plaintiff and the Class Members, and Defendants accepted that trust.

197.    Defendants breached the fiduciary duty that it owed to Plaintiff and the Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, the Private Information of Plaintiff and the Class Members.

198.    Defendants' breach of fiduciary duty was a legal cause of damage to Plaintiff and the Class Members.

199.    But for Defendants' breach of fiduciary duty, the damage to Plaintiff and the Class Members would not have occurred.

200.    Defendants' breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and the Class Members.

201.    As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff and Class Members are entitled to and do demand actual, consequential, and nominal damages, injunctive relief, and all other relief allowed by law.

**COUNT VI**
**Violation of the Electronic Communications Privacy Act ("ECPA")**
**18 U.S.C. § 2510, *et seq.***
**(On Behalf of Plaintiff and the Class)**

202.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

203.    A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . .

47

electronic communication" or "intentionally discloses, or endeavors to disclose, to any person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication."[44]

204.    In addition, "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication [ ] while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient."[45]

205.    As defined in 18 U.S.C. § 2510(12), "electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in party by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce."

206.    As defined in 18 U.S.C. § 2510(4), "intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."

207.    As defined in 18 U.S.C. § 2510(8), "contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue.

---

[44] 18 U.S.C. §§ 2511(1)(a), (c)–(d).

[45] 18 U.S.C. § 2511(3)(a).

208.    As defined in 18 U.S.C. § 2510(15), an "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications."

209.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

210.    Plaintiff's and the Class Members' use of Defendants' Online Platforms is an electronic communication under the ECPA.

211.    Defendants' Online Platforms are an electronic communication service under the ECPA.

212.    Whenever Plaintiff and Class Members interacted with Defendants' Online Platforms, Defendants contemporaneously and intentionally intercepted, and endeavored to intercept, Plaintiff's and Class Members' electronic communications without authorization or consent through the Tracking Pixel Defendants deployed and ran on their Website.

213.    Whenever Plaintiff and Class Members interacted with Defendants' Online Platforms, Defendants contemporaneously and intentionally disclosed, and endeavored to disclose, the contents of Plaintiff's and Class Members' electronic communications to Meta (Facebook), Google, and likely other third parties without authorization or consent through Defendants' configuration of the Tracking Pixel on their Website.

214.    Defendants knew or had reason to know that the electronic communications they intentionally disclosed and endeavored to disclose to unauthorized third parties were obtained in violation of the ECPA.

215.    Whenever Plaintiff and Class Members interacted with Defendants' Online Platforms, Defendants, through the Tracking Pixel deployed on their Website, contemporaneously

and intentionally used, and endeavored to use, the contents of Plaintiff's and Class Members' electronic communications for purposes other than providing health care services to Plaintiff and Class Members without authorization or consent and knowing, or having reason to know, that the electronic communications were obtained in violation of the ECPA.

216.    Whenever Plaintiff and Class Members interacted with Defendants' Online Platforms, Defendants, through the Tracking Pixel deployed on their Website, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications, while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communications, such as Meta (Facebook), Google, and other likely third parties.

217.    Whenever Plaintiff and Class Members interacted with Defendants' Online Platforms, Defendants, through the Tracking Pixel deployed on their Website, contemporaneously and intentionally divulged the contents of Plaintiff's and Class Members' electronic communications, while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Meta (Facebook), Google, and other likely third parties.

218.    Defendants intentionally intercepted and used the contents of Plaintiff's and Class Members' electronic communications for the unauthorized purpose of disclosing and profiting from Plaintiff's and Class Members' communications.

219.    Defendants' purposes for intentionally intercepting and using the contents of Plaintiff's and Class Members' electronic communications were tortious in that Defendants disclosed Plaintiff's and Class Members protected and confidential Private Information to

unauthorized third parties, invaded Plaintiff's and Class Members' privacy, and breached fiduciary duties to hold Plaintiffs' and Class Members' Private Information securely and in confidence.

220.    Plaintiff and Class Members did not authorize Defendants to acquire the content of their communications for purposes of sharing and selling the Private Information contained therein.

221.    Plaintiff, individually and on behalf of the Class Members, seeks all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs resulting from Defendants' violation of the ECPA.

**COUNT VII**
**Violation of New York General Business Law § 349**
**(On Behalf of Plaintiff and the Class)**

222.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

223.    N.Y. Gen. Bus. Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service" in the State of New York.

224.    Defendants engaged in "business," "trade," or "commerce" within the meaning of N.Y. Gen. Bus. Law § 349(a).

225.    Plaintiff and Class Members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

226.    By reason of the conduct alleged herein, Defendants engaged in unlawful practices within the meaning of N.Y. Gen. Bus. Law § 349. The conduct alleged herein is a "business practice" within the meaning of N.Y. Gen. Bus. Law § 349, and the deception occurred within the State of New York.

227.    On information and belief, Defendants formulated the systems used to record, maintain, and transmit patient information and oversaw the inadequate data security practices complained of herein largely within the State of New York, and Defendants' communications and other efforts to collect and maintain patient data largely emanated from New York.

228.    Most, if not all, of the alleged misrepresentations and omissions by Defendants that led to inadequate measures to protect patient Private Information occurred within or were approved within New York.

229.    Defendants make explicit representations to patients in their Privacy Practices and elsewhere that patients' Private Information will be kept confidential and protected in accordance with Defendants' Privacy Practices and applicable law. Yet, in contravention of Defendants' promises and legal obligations, Defendants disclose patients', including Plaintiff's and Class Members', Private Information to unauthorized third parties through Defendants' implementation of the Tracking Pixel on their Online Platforms.

230.    Defendants' implied and express representations that they would adequately safeguard Plaintiff's and Class Members' Private Information constitute representations as to the particular standard, quality, or grade of services that such services did not actually have (as the services were of another, inferior quality), in violation of N.Y. Gen. Bus. Law § 349.

231.    Defendants knew or should have known they did not employ reasonable, industry standard, and appropriate data security measures that complied with all relevant regulations and would have kept Plaintiff's and Class Members' Private Information secure and prevented the disclosure of Private Information to unauthorized third parties.

232.    Defendants did not disclose to Plaintiff or the Class Members that Defendants surreptitiously record and transmit patients' Private Information submitted through their Online Platforms to third parties, like Meta (Facebook) and Google.

233.    Plaintiff and Class Members would not have provided their Private Information if they were made aware of Defendants' failure to maintain sufficient data security measures, inability to safely store Plaintiff's and Class Members' Private Information, and configuration of the Tracking Pixel on its Online Platforms as described herein.

234.    As alleged herein, Defendants engaged in the unfair or deceptive acts or practices in the conduct of consumer transactions in violation of N.Y. Gen. Bus. Law § 349, including but not limited to:

      a.    Representing that their services were of a particular standard or quality when Defendants knew or should have known their services were of another, lesser standard or quality;

      b.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' Private Information, which was a direct and proximate cause of the Disclosure;

      c.    Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Disclosure;

      d.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Disclosure;

    e.      Misrepresenting that Defendants would protect the privacy and confidentiality of Plaintiff's and Class Members' Private Information, including by implementing and maintaining reasonable data security measures;

    f.      Omitting, suppressing, and concealing the material fact that Defendants did not reasonably or adequately secure Plaintiff's and Class Members' Private Information; and

    g.      Omitting, suppressing, and concealing the material fact that Defendants did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Disclosure.

235.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security, implementation of the Tracking Pixel on its Online Platforms, and ability to protect the confidentiality of consumers' Private Information.

236.    Such acts by Defendants are and were deceptive acts or practices which were likely to mislead a reasonable consumer providing his or her Private Information to Defendants.

237.    The requests for and use of such Private Information in New York through deceptive means occurring in New York were consumer-oriented acts and thereby fall under the protection of N.Y. Gen. Bus. Law § 349.

238.    The aforesaid conduct violated N.Y. Gen. Bus. Law § 349, in that it is a restraint on trade or commerce.

239.    In addition, Defendants' failure to secure patients' Private Information violated the FTC Act and therefore violates N.Y. Gen. Bus. Law § 349.

240.    Defendants knew or should have known that their computer systems, data security practices, and configuration of the Tracking Pixel were inadequate to safeguard the Private Information of Plaintiff and Class Members, detect unauthorized disclosures of Private Information within a reasonable time, and deter access to Private Information by unauthorized third parties.

241.    Defendants knew or should have known that the risk of disclosure of Plaintiff's and Class Members' Private Information to unauthorized third parties was highly likely given Defendants' configuration of the Tracking Pixel on their Online Platforms.

242.    Defendants' violations of N.Y. Gen. Bus. Law § 349 have an impact and general importance to the public, including the people of New York. Thousands of New Yorkers have had their Private Information stored on Defendants' electronic database, many of whom have been impacted by the Disclosure. In addition, New York residents have a strong interest in regulating the conduct of its healthcare service providers, whose inadequate data security practices described herein have affected the confidentiality of the Private Information of thousands of New Yorkers.

243.    As a direct and proximate result of these deceptive trade practices, Plaintiff and Class Members have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities, the loss of control of their Private Information, disruption of their medical care and treatment, lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Disclosure, the continued risk to their Private Information which remains in Defendants' possession, future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a

result of the Disclosure, and overpayment for the services that were received without adequate data security.

244.    Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff, on behalf of herself and the Class Members, seeks all monetary and non-monetary relief allowed by law, including damages in the amount of the greater of actual damages of $50 for each violation of N.Y. Gen. Bus. Law § 349, injunctive relief, and attorneys' fees and costs. Because Defendants' conduct was committed willfully and knowingly, Plaintiff and Class members are entitled to recover up to three times their actual damages up to $1,000.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a)    For an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

b)    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c)    For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Personal Information compromised during the Disclosure;

d)    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

e) Ordering Defendants to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

f) For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g) For an award of treble damages under N.Y. Gen. Bus. Law § 349 and any other applicable law;

h) For an award of attorneys' fees and costs under N.Y. Gen. Bus. Law § 349, the ECPA, the common fund doctrine, and any other applicable law;

i) Costs and any other expense, including expert witness fees incurred by Plaintiff in connection with this action;

j) Pre- and post-judgment interest on any amounts awarded; and,

k) Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 24, 2023

Respectfully Submitted,

*/s/ James Bilsborrow*
James Bilsborrow (JB8204)
**WEITZ & LUXENBERG, PC**
700 Broadway
New York, New York 10003
Tel: (212) 558-5500
jbilsborrow@weitzlux.com

Tyler B. Ewigleben*
Christopher D. Jennings*
Winston Hudson*
Laura Edmondson*
**THE JOHNSON FIRM**
610 President Clinton Ave., Suite 300

Little Rock, AR 72201
Tel: (501) 372-1300
chris@yourattorney.com
tyler@yourattorney.com
winston@yourattorney.com
ledmondson@yourattorney.com

Lynn A. Toops*
Amina A. Thomas*
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
T: (317) 636-6481
F: (317) 636-2593
ltoops@cohenandmalad.com
athomas@cohenandmalad.com

*To be admitted *pro hac vice*
*Counsel for Plaintiff and the Proposed Class*